IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | 8:17CR134 |
| vs. | |
| JALLANA LEMUZ, | FINDINGS AND RECOMMENDATION |
| Defendant. | |

This matter is before the Court on Defendant Jallana Lemuz's Motion to Suppress. ([Filing No. 15](#).) Lemuz is charged in a One Count Indictment with Possession with Intent to Distribute Cocaine Base (*i.e.*, "crack cocaine") in violation of 21 U.S.C. 841(a)(1) and 841(b)(1). ([Filing No. 1](#).) Lemuz seeks to suppress all evidence and statements obtained as a result of her detention and arrest in Douglas County, Nebraska on the morning of February 14, 2017. ([Filing No. 15](#).)

The Court held an evidentiary hearing on June 15, 2017. Lemuz was present with her attorney, Richard McWilliams. The United States was represented by Assistant United States Attorney, Martin Conboy, IV. The Court heard testimony of Douglas County Sheriff Deputy, Jarrod Wineinger. The Court received into evidence Deputy Wineinger's body camera video ("Ex. 1") and Lemuz's exhibits 101 through 118. (*See* [Filing No. 21](#).) A transcript (TR.) of the hearing was prepared and filed on July 10, 2017. ([Filing No. 25](#).) This matter is now fully submitted and ready for decision.

**BACKGROUND**

On February 14, 2017, Deputy Wineinger, who has been employed as a Douglas County Sheriff Deputy for 16 years, was working as a commercial interdiction officer and conducting surveillance at the Amtrak station in Omaha, Nebraska. (TR. 5.) At approximately 4:50 a.m., Deputy Wineinger was watching a train come into the station. (TR. 5.) At the time, Deputy Wineinger was in plain clothes, but was equipped with a body camera. (TR. 6.)

Deputy Wineinger testified at the hearing that as he was watching passengers disembark the train and proceed down the walkway, he noticed Lemuz walking close to the train with her head down. He stated that he observed that she was walking very fast compared to the other passengers. (TR. 5.) Deputy Wineinger testified that he believed Lemuz was walking in that manner to avoid eye contact. (TR. 7.) Deputy Wineinger also testified that, based on his experience, he has found that when most passengers disembark trains, they get as far away from the train and rails as possible. (TR. 7.)

When Lemuz walked by Deputy Wineinger, he noticed that she had a duffel bag and black backpack. He observed that both the duffel bag and backpack appeared to be new. (TR. 8.) At that point, Deputy Wineinger decided to speak to Lemuz. As he caught up with her, he noticed there was a plastic price tag ring still on the handle of the backpack. (TR. 8.) Deputy Wineinger testified that the duffel bag was stuffed pretty full and the backpack appeared to be half full. (TR. 8.) Deputy Wineinger also indicated that he did not see any identification tags on Lemuz's bags. (TR. 13.)

Deputy Wineinger made contact with Lemuz and identified himself with his badge. He told her no one was in trouble and that she was not under arrest. (TR. 10.) Lemuz looked at Deputy Wineinger, and responded by saying, "hi, how are you doing?" (TR. 10.) Deputy Wineinger asked Lemuz if he could ask her some questions. Lemuz agreed, and continued to walk and talk with Deputy Wineinger. (TR. 10.) Deputy Wineinger testified that Lemuz told him she was traveling from Denver to South Sioux City. (TR. 10-11.) Deputy Wineinger testified that when he asked her if she had any identification, Lemuz stopped walking and gave him her Colorado ID. (TR. 10.) Deputy Wineinger testified that he looked at her ID and gave it back to her. Deputy Wineinger stated that, at that point, Lemuz started walking again.[1] (TR. 11.)

Deputy Wineinger testified that he asked Lemuz the purpose of her trip and she said it was to visit her kids. (TR. 11.) Deputy Wineinger asked Lemuz to show him her online ticket.

---

[1] The sequence of events testified to by Deputy Wineinger often differ from what is depicted in the video of the encounter. (*See* Ex. 1.)

Deputy Wineinger testified that Lemuz stopped, got on her phone, found the ticket and presented it to him. (TR. 11.) Deputy Wineinger observed that it was a one-way ticket which was purchased on February 13, 2017, for travel on the 13th from Denver to Omaha. (TR. 11.) Deputy Wineinger noted that the ticket had the name of a third-party female on it. (TR. 11.) Deputy Wineinger asked Lemuz if she was listed on the ticket as the purchaser. Lemuz told him she was not, but that she was the other individual named on the ticket. (TR. 11.) Lemuz explained that her friend purchased the ticket for her. (TR. 14.) Deputy Wineinger gave Lemuz her phone back and asked how long she was going to be in South Sioux City. Lemuz indicated she had four days off of work. (TR. 14.) Deputy Wineinger testified that he felt that the amount of luggage Lemuz had with her did not match how long she was going to be in South Sioux City. (TR. 14.)

Deputy Wineinger testified that Lemuz was breathing heavily as they were talking. He further testified that when she gave him her phone to show him her information, her hands were shaking. (TR. 14, 33.) Deputy Wineinger testified that, at one point, Lemuz was on the verge of breaking down and crying. (TR. 31.) Deputy Wineinger stated that Lemuz's nervousness increased during his contact with her and that she started to speak faster. (TR. 16.) Deputy Wineinger testified that as Lemuz's nervousness increased, she tried to show Deputy Wineinger her bank information on her phone. (TR. 16.) Deputy Wineinger thought Lemuz was trying to distract him with her bank account information to avoid answering questions. (TR. 16.) Deputy Wineinger testified that he did not want to look at Lemuz's bank account information because he did not want to catch her bank account number or routing number on his body camera. (TR. 17.) Also, Deputy Wineinger stated that he did not think the bank account information was germane to the questions he was asking. (TR. 17.)

Deputy Wineinger testified that after Lemuz tried to show him her bank account information, he asked to search her luggage. (TR. 17-18.) Lemuz denied his request and said she was in a hurry to catch her bus. (TR. 18.) As they continued walking, Deputy Wineinger asked Lemuz if she would mind opening her luggage. Deputy Wineinger testified that Lemuz opened her pink duffel bag partially, and let Deputy Wineinger look inside. (TR. 19.) Deputy Wineinger testified that Lemuz "moved like one clothing item" in the bag, but that he could see another layer of clothing. (TR. 19.) Deputy Wineinger then testified that, as they were walking,

3

he asked Lemuz if she would move one of the clothing items in the bag. (TR. 20.) Deputy Wineinger stated that Lemuz told him no, and started talking about how she had already let him look in the bag. (TR. 20.) Deputy Wineinger stated that he explained to Lemuz that he could not see everything in the bag, but that he could search her bag as they walked. (TR. 20.) Deputy Wineinger testified that, at that point, Lemuz started to walk faster and said, "I'm showing you my bag." (TR. 20.) Deputy Wineinger asked Lemuz if he could look in her backpack. (Tr. 20.) Officer Wineinger testified that he does not recall how Lemuz responded to the question, but that, at that point, he decided to detain her. (TR. 20.) Deputy Wineinger requested that Lemuz consent to a canine sniff, and she refused. (TR. 20.) Deputy Wineinger then informed Lemuz that he was going to detain her for the canine sniff. (TR. 20.)

After Deputy Wineinger told Lemuz she was going to be detained, Lemuz continued to walk toward the terminal. Deputy Wineinger testified that he allowed her to do so and made no attempt to stop her. (TR. 21.) Deputy Wineinger stated that he allowed Lemuz to walk through the terminal to the cab pick-up area outside. (TR. 21.) Deputy Wineinger testified that he thought Lemuz's route through the terminal was significant because it was not the most direct way to the cabs. (TR. 21.) Once they were outside, Deputy Wineinger again asked for consent to search Lemuz's bags, and she refused. (TR. 22.) Then, Deputy Wineinger again informed Lemuz she was going to be detained for a canine sniff. (TR. 22.) Deputy Wineinger testified that following this exchange, Lemuz started talking to one of the cab drivers and acted like she was going to call someone, so he attempted to take her phone and she was placed in handcuffs. (TR. 22.) Deputy Wineinger testified that when Lemuz was placed in handcuffs, she was not under arrest. (TR. 23.) Deputy Wineinger stated that Lemuz was placed in handcuffs so that he could further the investigation. (TR. 23.)

After Lemuz was handcuffed, she was taken to the west side of the ticketing office. (TR. 24.) Investigator Peck, from the Nebraska State Patrol, stood with Lemuz while Deputy Wineinger got his canine out of his vehicle. (TR. 24.) While retrieving the canine, Deputy Wineinger explained to another officer that he detained Lemuz because she had purchased a last-minute, third-party ticket. He also stated that Lemuz provided him a false name. (TR. 30, 74; Ex. 1.) Deputy Wineinger testified that, when he returned, he began speaking with Lemuz because Investigator Peck informed him that Lemuz had said to him that it is "in the black

4

backpack and made a vague statement about thinking that someone put something in her backpack." (TR. 24.) However, because Deputy Wineinger felt that having the canine with him during their conversation could be coercive, he returned the canine to his vehicle. (TR. 24.) When Deputy Wineinger returned, he again asked for her consent to search her bags. (TR. 24-25.) Lemuz refused, and Deputy Wineinger went back and got the dog to do a canine sniff. (TR. 25.)

During the canine sniff, the dog alerted on the pink duffel bag only. (TR. 25.) After the alert on the duffel bag, the officers took Lemuz to the Douglas County Sherriff's office and Deputy Wineinger obtained a search warrant for both bags. (TR. 26.) The pink duffel bag contained clothing and makeup items. (TR. 26.) The backpack contained some food items, power cords, a hair brush, a pair of shoes, and a zippered makeup bag. In the bottom of the backpack, officers located a cellophane-wrapped, heat-sealed bundle of a white, powdery substance, which Deputy Wineinger believed was cocaine. (TR. 26.)

## DISCUSSION

Lemuz asserts that her Fourth Amendment rights were violated when she was detained by Deputy Wineinger and ultimately arrested. Lemuz requests that this Court suppress all evidence and statements obtained as a result of this allegedly unlawful detention and arrest.

Lemuz argues in her brief that officers detained Lemuz almost immediately. However, the Court finds that Lemuz's initial contact with Deputy Wineinger was consensual and, thus, did not trigger Fourth Amendment scrutiny. *See Florida v. Bostick*, 501 U.S. 429 (1991). "However, an initially consensual encounter can ripen into a seizure requiring reasonable suspicion or probable cause." *United States v. Campbell*, 843 F.2d 1089, 1092 (8th Cir. 1988). "If an officer, by means of physical force or show of authority, has restrained the liberty of a citizen . . . a seizure requiring objective justification has occurred." *Id*. "In determining whether a person has been seized, the inquiry is whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id*.

The government acknowledges that, at the time Lemuz was placed into handcuffs, what had started as a consensual encounter developed into a "*Terry*-type" investigatory stop requiring a reasonable articulable suspicion. The standard of articulable justification required by the

Fourth Amendment for an investigative seizure is whether the police officers were aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[ed] suspicion that a crime [was] being committed." *United States v. Martin, 706 F.2d 263, 265 (8th Cir. 1983)*).

In assessing whether the requisite degree of suspicion exists, a court must determine "whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion." *Campbell, 843 F.2d at 1093*. "The totality of the circumstances—the whole picture—must be taken into account." *Id.* (quotation omitted). Also, a court may consider "any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of criminals." *Id.* However, an officer's suspicion must not be based on a mere "hunch," or on circumstances which "describe a very broad category of predominantly innocent travelers." *Id.* (quotation omitted).

The government contends that the following circumstances gave rise to reasonable suspicion: (1) Lemuz was traveling from a purported drug "source city" to a "destination city;" (2) Lemuz had a one-way ticket; (3) the ticket was purchased on the day of travel by a third-party; (4) Lemuz was walking quickly and close to the train with her head down; (5) a price tag ring was still attached to her backpack and both of her bags appeared to be new; (6) her bags did not have identification tags; (7) the amount of luggage Lemuz carried did not appear to be consistent with the length of her trip; (8) Lemuz was breathing heavily and her hands were shaking when she was speaking with Deputy Wineinger; (9) she walked through the terminal to the cab pick-up area; and (10) she attempted to distract Deputy Wineinger by discussing her bank account information. (TR. 17-18.) Deputy Wineinger also testified that, at the time he detained her, he believed Lemuz had provided a fake name.[2] The Court finds that these factors, considering them in the totality, do not give rise to reasonable suspicion.

---

[2] Importantly, and as will be discussed below, Lemuz did not provide Deputy Wineinger a fake name.

The Eighth Circuit Court of Appeals found a similar list of circumstances insufficient to support a detention in *United States v. White*, 890 F.2d 1413, 1417 (1989). In *White*, drug interdiction officers stopped the defendant after he exited his flight from Los Angeles. According to the officers, the defendant raised suspicions because he (1) was traveling from a source city; (2) had arrived early in the morning; (3) was on a flight that had previously yielded arrests of drug traffickers; (4) had purchased a one-way ticket with cash; (5) held his carry-on bag closely with both hands; (6) appeared nervous as he walked through the airport; and (7) had trembling hands when he handed the officers his identification. *Id*. The Eighth Circuit concluded that the officers had relied on "fragmentary facts" which were insufficient to support an investigative stop. *Id*. at 1419.

Likewise, in *United States v. Eustaquio*, 198 F.3d 1068, 1070-71 (8th Cir. 1999), the Eighth Circuit found reasonable suspicion lacking where the government offered the following grounds for reasonable suspicion: (1) defendant's exhibiting nervous movement and a straight-ahead gaze; (2) defendant's choice of a direct path to leave the terminal; (3) defendant's not having any checked luggage; (4) defendant's arrival from a source city; (5) defendant's same-day purchase of a one-way airline ticket with cash; and (6) absence of friends and family meeting the defendant at the airport.

Even considering Deputy Wineinger's experience and training, the Court concludes that the combination of the factors outlined by the government does not generate reasonable suspicion to warrant Lemuz's detention.[3] *See United States v. Tovar-Valdivia*, 193 F.3d 1025, 1028 (8th Cir. 1999) ("Probable cause for a warrantless arrest depends . . . upon whether, at the moment the arrest was made, … the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense"). The grounds for Lemuz's detention, even when taken together, are consistent with innocent travel and entirely plausible under the circumstances.

---

[3] A question was raised as to when Lemuz was actually arrested. Because the Court concludes that there was no reasonable suspicion to detain Lemuz, the Court will not undertake an examination into the exact point in which the investigatory detention transformed into an arrest.

Lemuz's travel from a "source city" to a "destination city," in of itself, is not indicative of criminal activity. *See* United States v. Beck, 140 F.3d 1129 (8th Cir. 1998). Also, the Eighth Circuit has found that an officer's observation of a person arriving from a source city, moving quickly, and carrying a new bag does not support a finding of probable cause to arrest. *See* Tovar-Valdivia, 193 F.3d 1025. Moreover, a suspect's nervousness has been regularly scrutinized as a factor in assessing reasonable suspicion. *See* Beck, 140 F.3d at 1139 (finding that suspicion associated with nervous behavior is minimal at best).

Likewise, the fact that Lemuz was walking with her head down close to the train does not support a finding of reasonable suspicion. The video reveals that there were a number of other passengers walking close to the train and that, based on the position of other individuals on the walkway, Lemuz was limited as to where she could walk. Under these circumstances, the Court cannot find that where Lemuz was walking was suspicious, or could reasonably be construed as suspicious. The record reflects that at the time of the encounter, it was cold and dark. (TR. 42, 56.) It is not unreasonable that a female traveling alone would want to get to a lighted area and where she was going as soon as possible.

Another basis relied upon by the government in support of reasonable suspicion was Lemuz's possession of a ticket purchased by a third-party on the day of travel. However, Lemuz provided Deputy Wineinger with a reasonable explanation for the circumstances surrounding the ticket purchase. Lemuz informed Deputy Wineinger that she had to borrow money from her friend to purchase the ticket because she did not get paid until the day she arrived in Omaha. She went so far as to try and show Deputy Wineinger her bank account information to prove that her paycheck was deposited into her account at midnight, the day she arrived in Omaha. Still, the video reveals that Deputy Wineinger did not want to acknowledge or even consider this information. The information Lemuz provided—she did not get paid until the day she arrived in Omaha—reasonably explains why someone else purchased her ticket and why it was a one-way ticket. Also, Lemuz's ticket was purchased with a credit card, not cash.[4] All of these factors would lead a reasonable person to believe that Lemuz was part of the innocent, traveling public.

---

[4] A *cash* purchase of a ticket has been identified as a circumstance considered in evaluating reasonable suspicion. *See* United States v. Gallagher, 714 F. Supp. 811 (N.D. Tex. 1989).

Moreover, the lack of identification tags on Lemuz's bags and the presence of a plastic ring from a price tag attached to her backpack are insufficient to support a finding of reasonable suspicion. With respect to the baggage, Deputy Wineinger acknowledged that it was not suspicious that Lemuz did not having identification tags on her bags because the bags were always in her possession. (TR. 49.) Also, Deputy Wineinger admitted that he initially did not see the plastic ring from a price tag on the backpack. Deputy Wineinger only observed this when he caught up to Lemuz to start talking to her. (TR. 49-50.) The amount of luggage Lemuz was carrying was likewise not suspicious. In response to Deputy Wineinger's question about the length of her trip, Lemuz stated that she had four days off from work. The record does not reveal that she stated that she planned to be in South Sioux City for four days. (TR. 55.)

Additionally, there is no evidence in the record to suggest that Lemuz provided deceptive answers or was otherwise evasive. Lemuz did not provide inconsistent answers to Deputy Wineinger's questions about her trip. As revealed from the video, throughout their interaction, Lemuz repeatedly told him that she was concerned about missing her bus and catching a cab to the bus station. When Deputy Wineinger initially told Lemuz he was going to detain her, Lemuz asked Deputy Wineinger if she could walk through the terminal because she was concerned about getting a cab. (TR. 21, Ex. 1.) Deputy Wineinger allowed her to walk through the terminal to the cab pick-up area. He testified that he did not attempt to stop her. (TR. 21.) Once outside, Deputy Wineinger reassured Lemuz that she was not going to miss a cab. (Ex. 1.)

Also, Lemuz was forthright about her identity from the beginning of the encounter. Deputy Wineinger testified that, at the time he detained Lemuz and placed her in handcuffs, he believed she had provided him a false name. (TR. 74.) The video clearly shows that when Deputy Wineinger asked for her name, and *before* she gave him her ID and ticket, she told Deputy Wineinger that her name was "Jallana." (TR. 58; Ex. 1.) Deputy Wineinger acknowledged her name by saying "ok." (Ex. 1.) Deputy Wineinger stated that he got confused looking at the ticket because someone else purchased it. However, the video shows that Deputy Wineinger clarified who Lemuz was when he examined her ticket. The video reflects that after Lemuz provided him her ID and stated her name, Deputy Wineinger looked at her ticket, asked if she was "Christina," to which Lemuz truthfully responded that she was "Jallana." Lemuz went on to explain that her friend, Christina, purchased the ticket for her. At no time did Lemuz

indicate that she purchased the ticket. (Ex. 1.) Deputy Wineinger acknowledged that he understood Lemuz's explanation. Notably, when Deputy Wineinger was explaining to Lemuz why he was detaining her, he never mentioned his belief that she provided him a false name or was otherwise deceptive about her identity. (Ex. 1.) Frankly, there is no legitimate justification for Deputy Wineinger's asserted belief that Lemuz provided him a false identity.

While the Court recognizes that mistakes happen, a factual mistake, especially of this nature and magnitude, was completely unreasonable under the circumstances. *See [Heien v. North Carolina,—U.S.—, 135 S.Ct. 530, 539, 190 L.Ed.2d 475 (2014)](#)* ("The Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable. We do not examine the subjective understanding of the particular officer involved") (emphasis in original). Deputy Wineinger is an experienced interdiction officer. As an interdiction officer who routinely examines passenger tickets, the Court concludes that it was not objectively reasonable for Deputy Wineinger to get confused regarding Lemuz's identity, especially given the conversation between Deputy Wineinger and Lemuz as depicted in the video. Lemuz's identity is a crucial piece of information, particularly in this case. Candidly, the only shred of evidence Deputy Wineinger had which would even arguably support Lemuz's detention was that she provided a false name, which she did not do.

Deputy Wineinger's mistake of fact regarding Lemuz's identity, as well as the differences between Deputy Wineinger's recollection of the facts and what is depicted on the video, leads the Court to conclude that Deputy Wineinger's testimony is less than credible. Deputy Wineinger testified that Lemuz's hands were shaking when she showed him her phone, she was breathing heavily, and that she was on the verge of tears. However, the video of the encounter does not depict this. The Court will acknowledge that it may be hard for the video to pick up Lemuz heavy breathing due to sound issues, but the video does not reflect her hands shaking or that she was on the verge of tears at any point. Additionally, Deputy Wineinger indicated that his attention was initially drawn to Lemuz because she was walking close to the train. Still, the video shows other individuals walking in close proximity to the train. Moreover, Deputy Wineinger testified that Lemuz "moved like one clothing item" in the bag in response to his request to view its contents. (TR. 19.) However, the video shows Lemuz rummaging through her bag, and moving multiple items. Deputy Wineinger testified that Lemuz was

avoiding eye contact and, at one point, she began walking faster. (TR. 20.) Again, the video does not show this to be the case.

Based on the totality of facts in this case, the Court cannot find that there was reasonable suspicion to detain Lemuz. The evidence obtained in this case is tainted as a result of Lemuz's unlawful detention and should be suppressed. *See [Wong Sun v. United States, 371 U.S. 471 (1963)](#)*. Therefore, the Court will recommend that Lemuz's Motion to Suppress be granted.

Accordingly,

**IT IS HEREBY RECOMMENDED** to United States District Court Judge John M. Gerrard that Defendant's Motion to Suppress ([Filing No. 15](#)) be granted.

Dated this 11th day of August, 2017.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.